**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| Drexel Hamilton, LLC, | ) | |
| | ) | Civil Action No. 22-cv-6062 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OEP VIII General Partner, L.P., | ) | JURY TRIAL DEMANDED |
| OEP Capital Advisors, L.P., | ) | |
| One Equity Partners VIII, L.P., and | ) | |
| One Equity Partners VIII-A, L.P. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## COMPLAINT

## PARTIES

1. The Plaintiff, Drexel Hamilton, LLC ("DH"), is a Pennsylvania limited liability company with its principal place of business at 77 Water Street, Suite 201, New York, New York.

2. The Defendant, OEP VIII General Partner, L.P. ("OEP VIII GP"), is a limited partnership formed under the laws of the Province of Ontario (Canada) with its principal place of business at 330 N Wabash Avenue, Chicago, Illinois.

3. The Defendant, OEP Capital Advisors, L.P. ("OEP Capital"), is a Delaware limited partnership with its principal place of business at 330 N Wabash Avenue, Chicago, Illinois.

4. The Defendant, One Equity Partners VIII, L.P. ("OEP Equity"), is a limited partnership formed under the laws of the Province of Ontario (Canada) with its principal place of business at 330 N Wabash Avenue, Chicago, Illinois.

5. The Defendant, One Equity Partners VIII-A, L.P. ("OEP Equity A"), is a Delaware limited partnership with its principal place of business at 330 N Wabash Avenue, Chicago, Illinois.

6. OEP VIII GP, OEP Capital, OEP Equity and OEP Equity A are collectively referred to as "OEP".

## JURISDICTION AND VENUE

7. Jurisdiction is proper in this Court pursuant to 28 U.S.C. section 1332 (diversity of citizenship) and the amount in controversy exceeds $75,000.

8. Venue is proper in this Court pursuant to 28 U.S.C. section 1391 because a substantial portion of the events giving rise to the Plaintiff's cause of action occurred in this judicial district and division.  Also, the agreement between the parties state that each of the parties irrevocably and unconditionally submits to the exclusive jurisdiction of any state or U.S. federal court sitting in New York County over any suit, action or proceeding arising out of or relating to the agreement and the relationships created hereby.

## FACTS

A. DH AND OEP ENTER INTO A BUSINESS ARRANGEMENT FOR DH TO RAISE MONEY FOR OEP'S PRIVATE EQUITY FUNDS AND AGREE UPON A COMPENSATION STRUCTURE

9. DH is an investment bank 100% owned and operated by military Veterans who served in harm's way from Vietnam to Iraq and Afghanistan with a confidential list of clients, customers, and contacts.

10. Effective as of November 1, 2019, DH and OEP entered into the Placement Agreement whereby DH became a non-exclusive placement agent for One Equity Partners VII, L.P. ("Fund VII Placement Agreement").  The Fund VII Placement Agreement, at Exhibit C,

set forth DH's compensation for its services.   DH's fee, under the Fund VII Placement Agreement, was (among other things) "1% of the aggregate principal amount of the Capital Commitments from Approved Investors…"  The Fund VII Placement Agreement also contained a Discretionary Bonus Fee.

11. The Approved Investors for the Fund VII Placement Agreement consisted of single family offices, multi-family offices and RIA's.

12. In practice, DH used its confidential network of customers, clients and contacts to raise money for OEP's Fund VII.   OEP had no relationship with DH's customers and contacts and without DH would not have been able to obtain capital from these sources.

13. On February 5, 2020, DH and OEP Capital Advisors, L.P. entered into a Consulting Services Agreement ("DH Consulting Agreement").  The DH Consulting Agreement entitled DH to a one-time consulting fee of $500,000 ("Consulting Fee").  The DH Consulting Agreement also stated that the Consulting Fee would be off-set against any fees earned under any future placement agreement between OEP and DH.  Thus, DH, if it subsequently entered into a placement agreement with OEP would need to raise $50,000,000 before it would be entitled to a fee (1% of $50,000,000 equals $500,000 and, thus, the Consulting Fee would off-set that fee amount).

14. It was DH's expectation--based on the Fund VII Placement Agreement and numerous discussions with OEP's management--that the terms of any future placement agreement would be identical to the Fund VII Placement Agreement except that new Approved Investors identified by DH would be added to Exhibit A of future placement agreements, which lists the "Approved Investors".

15. It was DH's expectation, confirmed through multiple discussions with OEP's management, that the idea was to keep future placement agreements consistent and identical and, thus, only Exhibit A (Approved Investors) would be changed for each subsequent fund (along with the relevant fund as the contracting party).

16. DH raised significant funds for OEP pursuant to the Fund VII Placement Agreement.

17. DH and OEP--from the inception of their relationship--discussed and agreed that DH would continue to provide consulting services to OEP and would also continue to raise funds for OEP for its subsequent funds (Fund VIII and beyond).

B.  AFTER DH SUCCESSFUL FUNDRAISING FOR FUND VII, OEP REQUESTS AND ENCOURAGES DH CONTINUE TO RAISE FUNDS FOR FUND VIII, BUT STRINGS DH ALONG FOR MONTHS IN EXECUTING A FUND VIII PLACEMENT AGREEMENT

18.  To that end, after DH's successful fundraising for Fund VII, DH, at OEP's request and repeated encouragement,  continued its fundraising efforts for OEP's next fund,  Fund VIII.

19. On February 1, 2021, DH requested from OEP the placement agreement for OEP Fund VIII.

20. DH expressed to OEP that it was DH's understanding and expectation that the only edits that needed to be made to the Fund VIII Placement Agreement was to (1) change the contracting party to OEP VIII and (2) revise Exhibit A so that it includes the appropriate Approved Investors (single family offices, multi-family offices and RIA's).

21. OEP immediately responded, on February 1, 2021, that it would have its lawyers provide the placement agreement for OEP Fund VIII to DH for its review.  OEP did not inform DH, at that time, that any material terms of the placement agreement for OEP Fund VIII

would change from the Fund VII Placement Agreement or that DH's understanding and expectations were incorrect.

22. On February 16, 2021, DH followed up with OEP as to the status of the placement agreement for OEP Fund VIII.  OEP informed DH that its lawyers were working on the placement agreement for OEP Fund VIII and that DH should expect the agreement that week.

23. According to OEP, the only delay in providing the placement agreement for OEP Fund VIII to DH was that OEP was prioritizing the offering documents for Fund VIII and, as a result, OEP was extremely busy.

24. OEP never disclosed to DH that OEP was making any material edits to the placement agreement for OEP Fund VIII.

25. OEP did not provide the placement agreement for OEP Fund VIII as promised the week of February 16.  Thus, on February 26, 2021, DH followed up again with OEP.

26. On Saturday, February 27, 2021, OEP informed DH that it had nothing to provide to DH yet but that it would follow up with its lawyers and get back to DH on Monday, March 1, 2021.

27.  On March 2, 2021, after not getting the draft as promised the day before, DH again asked OEP for the placement agreement for OEP Fund VIII.  OEP responded that DH should have it in the next couple of days (by the end of the week, March 7, 2021).

28. As of March 8, 2021, OEP still had not provided the placement agreement for OEP Fund VIII to DH.  Thus, once again, DH reached out to OEP.

29. On March 8, 2021, OEP responded that there was some "internal email traffic over the weekend to finalize the specifics of the contract." OEP also acknowledged that it was taking a long time to provide DH with the placement agreement for OEP Fund VIII.

30. A week later, on March 15, 2021, since DH still had not received the placement agreement for OEP Fund VIII, DH reached out, again, to OEP. As DH had done earlier, on February 1, 2021, DH informed OEP that it was DH's understanding and expectation that the placement agreement for OEP Fund VIII would be identical to the Fund VII Placement Agreement with a revised Exhibit A to add additional Approved Investors. DH reminded OEP that it had already done significant work with investors for Fund VIII and that DH needed the placement agreement for OEP Fund VIII. DH had done its significant work with the investors with the expectation that it would be compensated on the same terms as it had been compensated on the Fund VII Placement Agreement.

31. OEP knew that DH was working on fundraising for Fund VIII under the expectation that the economic terms would be the same as Fund VII: 1% of the capital commitments for all approved investors.

32. On March 24, 2021, OEP informed DH that it was still waiting for the OEP "team" to give the "green light" on the placement agreement for OEP Fund VIII. OEP promised to continue to follow-up and keep DH updated and thanked DH for its patience.

33. When over a week passed and OEP still had not provided DH with the placement agreement for OEP Fund VIII—and DH's understanding that closings were occurring on Fund VIII on capital commitments that DH secured—DH reached out to OEP on numerous occasions requesting the placement agreement for OEP Fund VIII.

34. OEP assured DH that no closings had yet to occur but that the closings were imminent. Thereafter, DH stressed repeatedly the urgency of finally getting its contract. OEP stated that it had reached out to its lawyers for the placement agreement for OEP Fund VIII. Yet, no placement agreement for OEP Fund VIII was forthcoming.

35. On April 5, 2021, OEP informed DH that it had a status update call with its legal team scheduled for later in the day and that OEP would provide DH an update as to the placement agreement for OEP Fund VIII.

36. OEP, knowing full well what DH's expectations were relative to the placement agreement for OEP Fund VIII (namely, the economic terms would be exactly the same as the Fund VII Placement Agreement) told DH that OEP did not think "that there is any reason to be concerned."

37. As of April 7, 2021, DH still had not received the placement agreement for OEP Fund VIII. Thus, DH reached out to OEP's President (Richard M. Cashin) and reiterated that DH has been waiting for the placement agreement for OEP Fund VIII for a very long time and that DH was told, many times, that a draft was ready for DH but that no draft has ever been forthcoming. DH reminded OEP that it expected "minimal edits" given it was agreed and discussed that the terms of the placement agreement for OEP Fund VIII would be the same as the Fund VII Placement Agreement with the addition of Approved Investors.

   C.   AFTER MONTHS OF STRINGING ALONG DH REGARDING THE FUND VIII PLACEMENT AGREEMENT, AND AFTER DH HAD SECURED HUNDREDS OF MILLIONS OF DOLLARS FOR FUND VIII, OEP UNILATERALLY TRIES TO IMPOSE AN UNDISCLOSED COMPENSATION STRUCTURE AND PRACTICALLY ELIMINATE DH'S COMPENSATION FOR ITS FUNDRAISING

38. On April 22, 2021, OEP finally provided DH with the placement agreement for OEP Fund VIII ("Fund VIII Placement Agreement"). The Fund VIII Placement Agreement--despite numerous discussions and assurances that it would be identical to the Fund VII Placement Agreement--was entirely different in all material economic terms.

39. The Fund VIII Placement Agreement introduced, for the first time, the never discussed or agreed to concept that DH would only be compensated for so-called "incremental" investments in Fund VIII. For example, under OEP's newly invented construct, if the same investor invests $1 million dollars in Fund VII and then subsequently invests $1.5 million dollars in Fund VIII, DH's fee for the Fund VIII investment is based on the $500,000 incremental investment (not the entire $1.5 million investment).

40. The incremental concept that OEP unilaterally inserted into the Fund VIII Placement Agreement was never discussed between DH and OEP prior to receipt of the draft Fund VIII Placement Agreement on April 22, 2021.

41. DH never agreed to the concept of incremental compensation. At the time that OEP sprung this invented concept on DH, DH had already raised, at least, $200 million dollars for Fund VIII and, therefore, was entitled to a fee of $2,000,000 less the $500,000 Consulting Fee for a net fee to DH of $1,500,000.

42. DH has always raised funds for OEP with the expectation and understanding that it would be compensated 1% on all funds invested. OEP agreed to that deal and never once, until the Fund VIII Placement Agreement was provided to DH on April 22, 2021, did OEP ever discuss the incremental concept or disagree with DH in its numerous correspondence and discussions with OEP wherein DH stated its expectation that the Fund VIII Placement Agreement would be identical to the Fund VII Placement Agreement.

43.  As importantly, the Fund VIII Placement Agreement does not make commercial sense for DH.  For example, if a family office invested $180,000,000 in Fund VII and wanted to invest $220,000,000 in Fund VIII, then DH would only be paid on the $40,000,000 increase from Fund VII to Fund VIII.   This artificially inflated hurdle is not only illogical but is also a disincentive for DH.

44. Also, DH was advanced the $500,000 Consulting Fee against fees to be earned in OEP VIII.  OEP's unilateral, and drastic, reduction in the fees that DH is entitled to earn under the Fund VIII Placement Agreement make it virtually impossible for DH to ever reach the $500,000.  DH would not have agreed to credit the $500,000 Consulting Fee against future OEP VIII fees if it knew the economic terms of the Fund VIII Placement Agreement would be any different, at all, than the Fund VII Placement Agreement.

45. On April 28, 2021, DH informed OEP that the Fund VIII Placement Agreement was completely unacceptable and was not in conformity with the terms that OEP and DH agreed to.  Once again DH informed OEP that the agreement, and DH's expectations, were that the Fund VIII Placement Agreement would be identical to the Fund VII Placement Agreement with the addition of Approved Investors.

46. OEP, knowing that the final close on Fund VIII was imminent, tried to coerce DH into accepting OEP's incremental concept under duress.  OEP stated that it "only pay[s] on incremental commitment, [OEP is] not open to edits and today was the final close."

47. Thus, OEP intentionally strung along DH all the way to the final close on Fund VIII knowing that OEP had agreed to pay DH 1% on all funds raised and then, at the 11th hour (literally) informed DH that it could take OEP's deal or have no agreement at all.

48. On April 8, 2022, DH revised the Fund VIII Placement Agreement to match the terms of the deal that was agreed to with OEP, signed it and emailed it to OEP.

49. On April 8, 2022 DH sent an invoice to OEP for $2,670,000 for the 1% fee on the $317 million dollars raised by DH for Fund VIII less the $500,000 Consulting Fee.

50. On or about  April 13, 2022,  OEP publicly announced that it had closed Fund VIII with committed capital of $2.75 billion.

51. More than 10% of Fund VIII consists of funds raised by DH.

52. As of today, OEP owes DH, at least, $2,670,000 and has received no compensation for raising more than $300 million for Fund VIII.

## COUNT I
### (Breach of Contract)

53. DH repeats and realleges the allegations set forth above.

54. DH and OEP entered into the Fund VIII Placement Agreement.

55. DH performed under the Fund VIII Placement Agreement.

56. OEP breached the Fund VIII Placement Agreement.

57. DH suffered damages.

## COUNT II
### (Breach of Oral Contract)

58. DH repeats and realleges the allegations set forth above.

59. As set forth above, DH and OEP entered into an oral contract for fundraising for Fund VIII.

60. OEP agreed to pay DH 1% of all funds raised by DH for Fund VIII.

61. DH performed under the oral contract.

62. OEP breached the oral contract by refusing to pay DH in accordance with the agreement reached between the Parties

63. DH suffered damages.

## COUNT III
## (Promissory Estoppel)

64. DH repeats and realleges the allegations set forth above.

65. OEP made a clear and unambiguous promise to DH relative to fundraising for Fund VIII.

66. OEP promised to pay DH 1% of all funds raised by DH for Fund VIII.

67. DH reasonably and foreseeably relied on OEP promise and raised more than $300 million for Fund VIII

68. As a result, DH suffered damages.

## COUNT IV
## (Quantum Meruit)

69. DH repeats and realleges the allegations set forth above.

70. DH performed services in good faith for OEP.

71. OEP accepted those services.

72. DH expected to be compensated for those services.

73. The reasonable value of DH's services is, at least, $2,670,000.

## COUNT V
## (Unjust Enrichment)

74. DH repeats and realleges the allegations set forth above.

75. OEP was enriched at the expense of DH.

76. It is against equity and good conscience to permit OEP to retain the fee that DH earned for fundraising for OEP VIII.

## COUNT VI
### (Fraud)

77. DH repeats and realleges the allegations set forth above.

78. OEP made misrepresentation(s) or a material omission of fact which was false and known to be false.

79. OEP made a misrepresentation of fact that DH would be paid a 1% on all funds raised.

80. OEP's statement was false and known to be false by OEP.

81. OEP's representation was made for the purpose of inducing DH to rely upon it so that DH would raise funds from its customers and contacts for Fund VIII,

82. DH justifiably did so rely on the representation and raised more than $300 million for Fund VIII.

83. OEP knew that DH was raising hundreds of millions of dollars for Fund VIII based on the representation  that it would be paid 1% of all funds it raised.

84. DH was injured as it has not been compensated for the money that it raised for Fund VIII.

85. Alternatively, OEP's failure to disclose the incremental fee structure constitutes a material omission. OEP materially omitted in its communications with DH the fact that it would only pay DH on an incremental increase basis for Fund VIII.  OEP knew that it intended to only pay DH on an incremental basis, DH could not have known this information because it is not public and OEP did not disclose it.  At all times, OEP knew that DH was operating – and raised more than $300 million for Fund VIII - under the belief that it would be paid 1% of all funds it raised for Fund VIII not on an incremental basis. Despite DH's repeated references to OEP between February 2021 and April 2021

regarding being paid 1% on all funds raised for Fund VIII, and, while DH was in the process of raising hundreds of millions of dollars at OEP's direction for Fund VIII, OEP never disclosed that it intended to pay DH on an incremental increase basis. DH justifiably relied on its understanding of the compensation structure for Fund VIII in raising more than $300 million. OEP waited until DH had raised the money and closings were scheduled to reveal the incremental compensation structure. DH was injured as it has not been compensated for the money that it raised for Fund VIII.

## COUNT VII
## (Negligent Misrepresentation)

86. DH repeats and realleges the allegations set forth above.

87. There is a special or privity-like relationship imposing a duty on OEP to impart correct information to DH.

88. The information regarding payment to DH for fundraising on OEP VIII was incorrect.

89. OEP knew that DH was raising hundreds of millions of dollars for Fund VIII based on the representation that it would be paid 1% of all funds it raised.

90. DH reasonably relied on the information.

91. DH was injured.

## PRAYER FOR RELIEF

The Plaintiff prays that this Honorable Court enter judgment against OEP on Counts I through VII of the Complaint and grant such other and further relief as this Court deems just.

## DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a jury trial on all issues so triable.

Drexel Hamilton, LLC,

By its attorneys


/S/  Andrew E. Goloboy

Andrew E. Goloboy (AG3536)
N.Y. Bar No. 5063284
GOLOBOY LAW LLC
900 Cummings Center
Suite 207-V
Beverly, MA 01915
Tel: (617)409.7390
Fax: (617)360.3345
Email:  goloboy@goloboylaw.com


/s/ Ronald W. Dunbar, Jr.

Ronald W. Dunbar, Jr. (*pro hac vice forthcoming*)
DUNBAR LAW P.C.
10 Post Office Square
Boston, MA 02109
Tel: (617) 244-3550
Fax:  (617) 248-9751
Email: dunbar@dunbarlawpc.com


Dated:  July 15, 2022